IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DENNY BINGHAM,

                Plaintiff,

vs.

UNION PACIFIC RAILROAD CO.,

                Defendant.

**8:22–CV–118**

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Denny Bingham filed suit against his former employer, Union Pacific Railroad Company (Union Pacific), under the Americans with Disabilities Act, as amended by the Americans with Disabilities Amendments Act of 2008, 42 U.S.C. § 12101, *et seq*. (ADA). Filing 1 at 1–4. While employed at Union Pacific, Bingham suffered an acute ischemic stroke on May 2, 2019. Filing 1 at 2; Filing 7 at 2. Bingham alleges that as a result of his stroke and Union Pacific's failure to abide by the ADA, he was "effectively terminated for unsubstantiated concerns regarding [his] risk of sudden incapacitation." Filing 1 at 1. He filed suit in this Court asserting "that Union Pacific intentionally discriminated against him on the basis of disability and failed to grant him a reasonable accommodation." Filing 46 at 55 (¶133). Count I of Bingham's Complaint alleges a disparate treatment claim while Count II of his Complaint alleges a failure to accommodate claim. Filing 1 at 3–4. This matter is now before the Court on Union Pacific's Motion for Summary Judgment. Filing 38. For the following reasons, the Court grants summary judgment in Union Pacific's favor on both Counts.[1]

---

[1] Union Pacific separately filed a Motion to Strike the declaration of an expert. Filing 43. The Court's resolution of Union Pacific's Summary Judgment Motion moots the need to resolve its Motion to Strike for the reasons explained later in this Order.

# I.   BACKGROUND

## A.   Bingham's Work History at Union Pacific

Bingham began working for Union Pacific in 2005 and was assigned to the engineering department. Filing 46 at 55 (¶134). He was initially employed as a "track-repair laborer," which required him to place railroad ties on the track and replace broken rails. Filing 46 at 55 (¶135). However, he soon "began working as an on-rail machine operator, where he ran the ballast regulator. In that role he would regulate the rock and the slope of the rock placed on railroad tracks to keep the tracks from shifting." Filing 46 at 55–56 (¶136). Bingham held that position for approximately six months. Filing 46 at 55–56 (¶136). Following a brief furlough, he "returned as a weed mower operator where he would operate a cab tractor to mow the right of ways next to the railroad tracks." Filing 46 at 56 (¶137). After working as a weed mower operator for two years, Bingham then became a "track inspector." Filing 46 at 56 (¶138). Bigham was a track inspector at all relevant times pertinent to this suit. Filing 46 at 2 (¶6).

## B.   Bingham's Duties as a Track Inspector

Track inspectors are considered "safety-sensitive" positions by the Federal Railroad Administration (FRA). Filing 46 at 6 (¶22); *see also* 49 C.F.R. § 214.7. As a track inspector, Bingham worked by himself, drove a "hi-rail" vehicle, and was "responsible for inspecting and performing some maintenance and repair of Union Pacific railroad tracks for defects." Filing 46 at 2 (¶¶7, 8).[2] He "was responsible for inspecting approximately 150 miles of track per shift." Filing 46 at 4 (¶16). Bingham would begin his shift at the Union Pacific railyard in Gering, Nebraska, and then drive the hi-rail vehicle to the portion of the railroad he was required to inspect.

[2] A "hi-rail" is defined by the Federal Railroad Administration to mean "a roadway maintenance machine that is manufactured to meet Federal Motor Vehicle Safety Standards and is equipped with retractable flanged wheels so that the vehicle may travel over the highway or on railroad tracks." 49 C.F.R. § 214.7.

Filing 46 at 3 (¶11). It could take him anywhere from twenty minutes to two hours to arrive at his destination. Filing 46 at 3 (¶12). As such, Bingham drove hundreds of miles on highways and roads. Filing 46 at 3 (¶12). He was also required to be "on-call and would get called into work on any given date, day or night, in all weather conditions to address issues that impact the safety of the rails such as floods or other events[.]" Filing 46 at 6 (¶21). According to Bingham, being a track inspector is a "difficult" job and "is not a position for everybody." Filing 40-2 at 71-72.

Once Bigham arrived at his destination for the day, he began by first seeking permission from dispatchers "to enter the Union Pacific main line" (*i.e.*, active rails). Filing 46 at 3 (¶13). He would then inspect his hi-rail vehicle for defects and ensure that he had his personal protective equipment (*e.g.*, safety glasses, hard hat, ear protection). Filing 46 at 4 (¶14). After sitting on the railroad crossing and engaging the hi-rail, Bingham would begin driving down the rail "look[ing] for defects in the track, defects in other Union Pacific equipment such as wayside signals and signs, as well as other environmental issues that may impact safety[.]" Filing 46 at 4–5 (¶¶15, 17). In order to perform his duties as a track inspector, Bingham was required "to frequently get out of his vehicle . . . to conduct inspections, including inspecting railroad switches, ties, and similar items." Filing 46 at 5 (¶18). He "also performed some maintenance and repairs on the rails." Filing 46 at 5 (¶19). Bingham estimated that on some occasions he had to exit his vehicle up to "[o]ne hundred times a day." Filing 46 at 5 (¶18) (citing Filing 40-2 at 21). Sometimes while he was working outside of the hi-rail and inspecting track, active trains would pass by Bingham on live rails that were next to him. Filing 46 at 5 (¶20).

During his deposition, Bingham agreed that a track inspector is a "safety sensitive" position. Filing 40-2 at 30. When asked whether it was a "[d]angerous job that [he] did[,]" Bingham responded, "Yes. The railroad is a dangerous job." Filing 40-2 at 27. He also admitted

3

that were he to lose consciousness suddenly while outside of his truck, he could pose a danger to himself and others given the potential to stumble, fall, and be hit by a locomotive or train. Filing 40–2 at 26–27.[3]

### C.  Bingham's Stroke and Hospitalization

On or about May 2, 2019, Bingham woke up with a continuing headache that had started to manifest the night before. Filing 46 at 9 (¶27). While attending his child's soccer game, Bingham's ex-wife told him that "he looked pale and that his speech was slurred." Filing 46 at 9 (¶28). Bingham went to a medical clinic where his blood pressure was taken. Filing 46 at 9 (¶29). He was then advised by the clinic's medical personnel that he "needed to immediately go to the hospital." Filing 46 at 9 (¶29). Bingham followed this advice and proceeded to the emergency room at Regional West Medical Center. Filing 46 at 9 (¶30). When he arrived, his blood pressure was 220/80 and he reported trouble talking. Filing 46 at 9 (¶31). Results from a computed tomography (CT) scan and magnetic resonance imaging (MRI) "confirmed that Bingham had an 'acute left frontal lobe stroke.'" Filing 46 at 9 (¶32). Specifically, "Bingham had an acute small infarct in the lateral left frontal lobe measuring 6 mm in diameter." Filing 46 at 9 (¶33). Bingham's "treating providers concluded that the stroke was likely caused by long-standing hypertension and [his] noncompliance with his blood pressure medication." Filing 46 at 10 (¶34).[4]

While Bingham was still in the hospital, Union Pacific sent him a letter regarding his medical leave status. Filing 46 at 11 (¶38); Filing 40-19 at 1. Bingham was informed that he was

---

[3] Bingham claims to dispute these facts because "[t]he risk of harm from a track inspector suddenly losing consciousness is minimal" and "implies the risk of serious harm from an employee suddenly losing consciousness is high for every position at the railroad." Filing 46 at 8 (¶¶25, 26). However, these are arguments relating to how the deposition testimony should be construed; Bingham does not dispute that he so testified or contend that such testimony is controverted. The Court will consider this deposition testimony in the appropriate context.

[4] Bingham disputes this fact only to the extent "it implies that [he] has continued to forgo taking his medicine" and further asserts that "[h]e now takes it regularly." Filing 46 at 10 (¶34). The Court does not consider it for any such implication.

placed on a medical leave of absence from May 2, 2019, to July 3, 2019. Filing 40-2 at 86. He was also advised that he would need to undergo a fitness for duty (FFD) examination before returning to work. Filing 46 at 38 (¶91). In this letter, Union Pacific also requested medical records relevant to Bingham's stroke. Filing 46 at 38 (¶92). Bingham spent five days at Regional West Medical Center and was discharged on May 7, 2019. Filing 46 at (¶35). None of the doctors who treated Bingham during his hospital stay provided him with a release to return to work. Filing 46 at 10 (¶37) (citing Filing 40-2 at 44). However, "[h]is treating provider at the hospital told Bingham to follow up with a neurologist when he was discharged." Filing 46 at 10 (¶36).

### D. Bingham's Follow-Up Care

On May 10, 2019, Bingham saw Jennifer Griebel, a family nurse practitioner, for follow-up care. Filing 46 at 11 (¶¶38, 39). According to Griebel, this was the first time that Bingham had visited her. Filing 40-5 at 11. "Griebel has no specific training in neurology, does not evaluate individuals for fitness for duty . . . and has never evaluated any railroad workers for their ability to safely perform their job." Filing 46 at 11 (¶40). During her deposition, Griebel stated that she could not recall ever discussing Bingham's specific job duties at Union Pacific with him. Filing 40-5 at 9. She also stated that she did not "know what position he held when he was working at the railroad." Filing 40-5 at 9. Griebel further testified that if she had evaluated Bingham's fitness for duty that would have been notated in her records, but her records did not reflect that any such assessment had been done. Filing 40-5 at 13.

On June 6, 2019, Bingham met with Dr. Tracie Caller, a neurologist. Filing 46 at 13 (¶44); Filing 42-4 at 2.[5] In a declaration she signed on February 23, 2023, Dr. Caller said she was unaware of Bingham's "job duties in his position with Union Pacific" and that she "did not evaluate his

---

[5] According to Bingham, Dr. Caller is the only neurologist who examined him. *See* Filing 46 at 13 (¶45).

fitness to return to work and provided no opinion regarding his fitness for duty or his ability to return to work." Filing 40-8 at 1. Dr. Caller later completed a second affidavit in connection with this case on March 31, 2023. *See generally* Filing 42-4. In this affidavit, she states that her examination of Bingham on June 6, 2019, "demonstrated that [he] had recovered from his stroke and that restrictions were therefore unwarranted." Filing 42-4 at 2.[6] Dr. Caller's latter declaration does not explain or otherwise expand on what she means by the term "restrictions"—whether they be workplace, lifestyle, dietary, or other. *See generally* Filing 42-4. Regardless, at no point in her latter declaration did Dr. Caller ever refute any of the original statements she made in her first declaration. *Compare* Filing 40-8 *with* Filing 42-4. Therefore, notwithstanding Dr. Caller's later statement "that Mr. Bingham had recovered from his stroke and that restrictions were therefore unwarranted[,] Filing 40-8 at 2, Dr. Caller also acknowledged that she was "unaware of Denny Bingham's job duties with Union Pacific[,]" she "did not evaluate his fitness to return to work[,]" and she could not "provide any relevant testimony with regard to Mr. Bingham's medical condition or treatment beyond what is contained in" certain medical records. *See* Filing 40-8 at 1.

On June 10, 2019, Bingham saw Griebel again. Filing 46 at 16 (¶49). Although Griebel admitted during her deposition that she has never evaluated any railroad workers for their ability to safely perform their jobs, did not recall ever discussing Bingham's specific job duties with him, and had no record of conducting a fitness for duty assessment of Bingham, she ultimately "sign[e]d paperwork to release Bingham back to work on June 10, 2019[.]" Filing 46 at 62 (¶164). Specifically, Griebel completed an "Attending Provider Statement" which asked, "What specific physical, cognitive or behavioral activity/function is the patient unable to do?" Filing 40-10 at 1.

---

[6] Union Pacific has moved to strike this affidavit based upon the failure to disclose this expert opinion in accordance with Rule 26 of the Federal Rules of Civil Procedure. *See* Filing 43 at 1. The Court will consider it for the limited purposes of ruling on the Motion for Summary Judgment, and because the Court grants summary judgment in Union Pacific's favor, finds it unnecessary to rule on the matter. The Court will therefore deny Filing 43.

Griebel wrote, "n/a No restrictions." Filing 40-10 at 1. The form also asked, "What specific physical, cognitive or behavioral activity/function related to the conditions you are managing can the patient still do?" Filing 40-10 at 1. Griebel wrote, "no restrictions." Filing 40-10 at 1.

However, Bingham's medical records from his visit with Griebel on June 10, 2019, state, "I did sign paperwork to release [Bingham] back to work today stating that I cannot promise will [sic] not have an additional stroke but that his blood pressures [sic] currently controlled." Filing 42-5 at 3.[7] When asked to explain this notation during her deposition, Griebel said,

> I meant that I thought he was physically capable of performing tasks; however I could not rule out any additional stroke if he was not going to take medication or the fact he was at increased risk for stroke anyways given his prior history, his sleep apnea and his blood pressure. I thought he was physically capable of performing a job. I could not clear him from any additional risks.

Filing 40-5 at 18.

During her deposition, Griebel also agreed that she never evaluated Bingham for his risk of future seizures and that she never evaluated Bingham for "his risk of future seizures or stroke impacting his ability to safely perform his job at Union Pacific." Filing 42-6 at 3. She likewise agreed that she did not "release Mr. Bingham back to work based upon any evaluation of his risk of sudden incapacitation." Filing 42-6 at 3.

### E. Bingham's Fitness For Duty (FFD) Evaluation

At Union Pacific's request, Bingham provided Union Pacific with medical records pertinent to his stroke and subsequent treatment. Filing 46 at 38–39 (¶¶92–93). They included the medical records from Regional West Medical Center, the medical records related to Bingham's appointments with Griebel in May and June of 2019, and medical records from Dr. Caller as well.

---

[7] These same medical records also include a notation from Griebel stating, "Neurology would not clear [Bingham] from work due to his risk for another stroke." Filing 42-5 at 3.

Filing 46 at 38–39 (¶93). These records were then reviewed by Dr. Matthew Hughes, "a board certified occupational medicine physician who worked as an Associate Medical Director for Union Pacific from 2012 until 2020." Filing 46 at 39 (¶¶94, 98).[8] "Dr. Hughes never examines the employee" when "deciding whether to impose workplace restrictions[.]" Filing 46 at 65 (¶173). Consistent with this practice, Dr. Hughes did not examine Bingham in conducting the FFD examination. Filing 46 at 65 (¶172). Dr. Hughes also did not consult with any of Bingham's treating doctors or any specialists when determining whether to impose workplace restrictions on him. Filing 46 at 66 (¶¶174, 176). Dr. Hughes has no recollection of "speaking with Bingham when determining whether workplace restrictions should be issued with him." Filing 46 at 66 (¶175). Instead, "Dr. Hughes only reviewed Bingham's medical records" in arriving at his determination. Filing 46 at 67 (¶180).

After reviewing Bingham's medical records as part of the FFD evaluation, Dr. Hughes "concluded that . . . Bingham suffered from a frontal cortex cerebrovascular accident or stroke which caused him to have a significantly increased risk for incapacitates as well as potential effects from the stroke itself." Filing 40-21 at 1–2; Filing 46 at 39–40 (¶¶99, 100).[9] Although Dr. Hughes cleared Bingham to work, he also "recommended that Bingham have functional work restrictions for a period of five years." Filing 46 at 39 (¶99), 41 (¶102). Dr. Hughes ultimately recommended the following restrictions:

> 1. Not to operate company vehicles, on-track or mobile equipment, or forklifts.
> 2. Not to work on or near moving trains, freight cars or locomotives, unless protected by barriers. (Clarification: This means remaining between the rails or to

---

[8] Bingham's retained expert, Dr. Kevin Trangle, agreed that it was appropriate for Union Pacific to conduct an FFD evaluation of Bingham after his stroke. Filing 46 at 49 (¶117).

[9] Bingham that "Dr. Hughes exercised any discretionary judgment or made an individualized determination." Filing 46 at 39–40 (¶99, ¶100). However, Bingham does not dispute the underlying facts that Dr. Hughes reviewed all of Bingham's medical records, concluded that Bingham suffered a frontal cortex cerebrovascular accident or stroke which caused him to have a significantly increased risk for incapacitates as well as potential effects from the stroke itself, and recommended workplace restrictions.

the field side of the track where there are adjacent tracks with less than 19-foot
track centers).

3. Not to operate cranes, hoists, or machinery, if these activities might create a risk
of harm to others or a risk of catastrophic injury to the employee.

4. Not to work at unprotected heights, over 4 feet above the ground. (Clarification:
Employee can work on the beds of vehicles; and employee can occupy bridges
following normal safety practices).

5. Not to work on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or
helper job, 2-man section gang). Must have at least two additional employees on
gang or at work area to accommodate the provisions of Train Approach Warning
regulations (Lookout) or Train Approach Warning provisions may not be used.
Also add restriction below for workers with - seizures, psychiatric disorders or
cognitive concerns

6. Not to perform work where decisions or actions can affect the safety of others
(not to work as a Train Dispatcher or similar safety sensitive positions).

Filing 46 at 43–44 (¶105) (citing Filing 40-22 at 4).

Bingham subsequently provided additional medical records to Union Pacific. Filing 46 at
44 (¶106). Dr. Hughes reviewed these additional records on July 11, 2019, "and concluded that
the sudden incapacitation restrictions would remain in place for a five year period, but no other
restrictions would be imposed." Filing 46 at 44 (¶106).[10] "Later that same day, Dr. Hughes received
the remainder of the medical records submitted by Bingham." Filing 46 at 45 (¶107). After
reviewing them, he concluded that Bingham could "be cleared with the restrictions as noted
prior[.]" Filing 46 at 45 (¶107).

### F.  Union Pacific's Determination as to Bingham's Ability to Perform the Essential Functions of His Job

Bingham's medical restrictions were provided to his immediate supervisor, Jeff Poppe.
Filing 46 at 45 (¶¶ 108, 109). Despite being his immediate supervisor, Poppe "has never met or
spoken with Bingham." Filing 46 at 70 (¶191). Poppe ultimately "signed a letter stating that

---

[10] Bingham again disputes this "to the extent the statement suggests that Dr. Hughes performed an individualized
analysis." Filing 46 at 44 (¶106). As before, the Court considers the fact that Dr. Hughes reached these determinations
and made recommendations based upon them but recognizes that Bingham disputes the legal implications attendant
to these determinations.

Bingham's work restrictions could not be accommodated." Filing 46 at 70–71 (¶190).[11] During his deposition, Bingham opined that the restrictions were inappropriate and that "Union Pacific's doctors were wrong" to impose them. Filing 40-2 at 59, 70. However, when asked why he thought they were imposed, Bingham responded, "Well, I believe maybe for their -- their safety and the other employees." Filing 40-2 at 70. Bingham testified that he did not believe Union Pacific "had it out for" him or "wanted to get rid of" him. Filing 40-2 at 71. Bingham also testified that he was never given a reason for being withheld from service other than the medical restrictions and that no one had ever told him they were withholding him from his trackman position other than because of these medical restrictions. Filing 40-2 at 153.

## II.  LEGAL ANALYSIS

### A.  Rule 56 Standards

Pursuant to Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). The party opposing summary judgment must "cit[e]

---

[11] Bingham does not dispute that these medical restrictions precluded him from performing all of the job duties of a track inspector. Filing 46 at 46 (¶110). However, he contends that "most of the restrictions could have been accommodated." Filing 46 at 46 (¶110). He acknowledges that Union Pacific could not have accommodated the restriction against operating company vehicles in a track inspector position but submits "there was no need for that prohibition." Filing 46 at 46 (¶110). Bingham also contends there are other positions "that [he] could have held where even that restriction could have been accommodated." Filing 46 at 46 (¶110).

particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019).

### B.  Disabilities Under the ADA

As noted previously, Bingham has brought both a disparate treatment claim (Count I) and a failure to accommodate claim (Count II) in this lawsuit. Bingham can go forward on his disparate treatment claim in any one of three ways; he can show that he is actually disabled, he can show that he has a record of disability, or he can show that Union Pacific regarded him as disabled. 42 U.S.C. § 12102(1); *see also* 29 C.F.R. § 1630.2(g)(1)–(3). However, Bingham can only go forward on his reasonable accommodation claim by establishing that he is actually disabled or has a record of disability; he cannot proceed on this claim by arguing that Union Pacific regarded him as disabled. *See Duello v. Buchanan Cnty. Bd. of Sup'rs*, 628 F.3d 968, 972 (8th Cir. 2010) ("Under long-held circuit precedent, 'regarded as' plaintiffs are not entitled to reasonable accommodations because the ADA was not intended to grant reasonable accommodations to those who are not

11

actually disabled" (citing *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir.1999)); *see also* 29 C.F.R. § 1630.2(o)(4).[12]

For purposes of the ADA, a disability is "a physical or mental impairment that substantially limits one of more major life activities of [an] individual." *Id.* (quoting 42 U.S.C. § 12102(1)).

> The ADA does not define physical impairment, but the EEOC, exercising its statutory authority to issue regulations implementing the ADA . . . has defined the term to mean "[a]ny *physiological disorder or condition,* cosmetic disfigurement, or anatomical loss *affecting one or more body systems,* such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]"

*Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1108 (8th Cir. 2016) (emphasis in original) (quoting 29 C.F.R. § 1630.2(h)(1)).

The EEOC has likewise defined the term "physical or mental impairment" to mean, "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population[,]" but not every impairment constitutes a disability. 29 C.F.R. § 1630.2(j)(1)(ii).[13] The Court begins its analysis by looking to whether Bingham has established he

---

[12] *See also Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1080 (8th Cir. 2009) ("an employee who is 'regarded as disabled' is not entitled to a reasonable accommodation"); *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 460 (8th Cir. 2010) ("Because she alleges that Union Pacific discriminated against her based on a perceived mental disability, this court cannot consider a claim for reasonable accommodations"); *Fischer v. Minneapolis Pub. Sch.*, 792 F.3d 985, 990 (8th Cir. 2015) (citing *Duello* for the proposition that "an employer has no duty to accommodate an employee who is not actually disabled").

[13] Generally speaking, "the ADA Amendments Act ('ADAAA') . . . relaxed the requirements for showing a disability[,]" *Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019). However, "[t]he Eighth Circuit has noted the amendments' directive to 'construe[ ] broadly in favor of expansive coverage' does not apply to the definition of 'physical impairment.'" *Jackson v. Union Pac. R.R. Co.*, No. 419CV00069RGERAW, 2021 WL 1726895, at *13 (S.D. Iowa Mar. 29, 2021) (citing *Morriss*, 817 F.3d at 1111); *see also Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 889 (7th Cir. 2019) ("While Congress criticized the Supreme Court's understanding of 'substantially limits a

was actually disabled, has a record of disability, or was regarded as having a disability, because the answers to these questions have the potential to be case dispositive.[14]

### 1. Bingham Does Not Have an Actual Disability

#### a. The Parties' Arguments

Union Pacific argues that Bingham does not have an actual disability and supports this contention by citing to Bingham's own deposition testimony where he denied having "any sort of physical or mental impairment that [he was] aware of" and insisted that he was not "limited in any way in [his] life because of a physical or mental impairment[.]" Filing 47 at 5 (citing Filing 40-2 at 67); Filing 39 at 10. Bingham counters that "Union Pacific has repeatedly asserted that [his] medical condition prevents him from working for five years because he is purportedly unable to operate company vehicles, work on or near moving trains, or work where decisions can affect the safety of others." Filing 42 at 11. Thus, in Bingham's view, Union Pacific's own physician determined that he was disabled. Filing 42 at 11.

#### b. Applicable Standards

An "actual" disability is "'a physical or mental impairment that substantially limits one or more major life activities of [an] individual[.]'" *Canning v. Creighton Univ.*, 995 F.3d 603, 614 (8th Cir. 2021) (quoting 42 U.S.C. § 12102(1)), *cert. denied*, 142 S. Ct. 585 (2021); *see also* 29 C.F.R. § 1630.2(g)(1)(i). "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general

---

major life activity' at length, it said nothing about judicial interpretation of impairment") (citing the Eighth Circuit's decision in *Morriss*, 817 F.3d at 1111); 29 C.F.R. § 1630.2(j)(1)(i).

[14]As discussed in furth detail below, Union Pacific and Bingham dispute whether the *McDonnell Douglas* burden shifting framework applies to this case. Regardless of whether this framework applies, Bingham correctly acknowledges that he must still establish that he has an actual disability, a record of disability, or was regarded as having a disability. *See* Filing 42 at 10. If he cannot show any of these, then he cannot go forward on either count and the question of whether *McDonnell Douglas* applies is moot.

population[,]" but as mentioned above not every impairment constitutes a disability. 29 C.F.R. §
1630.2(j)(1)(ii); *see also Neely v. PSEG Tex. Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013)
("[T]hough the ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from
proving one" (emphasis in original)); *Feldman v. L. Enf't Assocs. Corp.*, 955 F. Supp. 2d 528, 539
(E.D.N.C. 2013) (considering a case involving a "transient ischemic attack" or "mini stroke" under
the ADA and noting that even if the plaintiff could establish an impairment, he still needed to show
that it substantially limited a major life activity in order to constitute a disability).

       c.  Discussion

      As a starting point, Bingham does not identify any particular condition that he claims gives
rise to his disability. He makes frequent reference to an unspecified "neurological condition" in
his brief, but that is as descriptive as he gets. *See e.g.*, Filing 42 at 4, 6, 8, 10, 13, 16, 26. Regardless,
Bingham's own testimony does not support the existence of an "actual" disability. *See* Filing 40-
2 at 67. When asked whether he claimed to have a disability, Bingham responded, "No, I don't."
Filing 40-2 at 67. When asked if he had had "any sort of physical or mental impairment that [he
was] aware of[,]" Bingham replied, "No." Filing 40-2 at 67. When asked if he was "limited in any
way in [his] life because of a physical or mental impairment[,]" Bingham said, "No." Filing 40-2
at 67. Finally, when asked if there was "anything [he was] unable to do right now because [of] any
sort of health condition[,]" Bingham answered, "No. Not that I believe." Filing 40–2 at 67. Given
these categorical denials, no reasonable jury could find that Bingham has an actual disability within
the meaning of the ADA.

      Bingham's brief also does little to suggest a contrary conclusion. *See* Filing 42 at 1. In it,
he plainly admits to having "suffered a minor stroke" from which he has "recovered completely[.]"
Filing 42 at 1. He goes on to argue that "his treating physicians, including a neurologist, cleared
him without restrictions, meaning that *he could perform any activity that any ordinary person*

*might*—including driving a car, climbing a ladder, or caring for family members or others." Filing 42 at 3 (emphasis added). It is also undisputed that Dr. Trangle—an occupational medicine doctor whom Bingham retained as an expert in this case—"testified that Bingham had no limitations impacting a major life activity and [that Bingham] was 'completely normal.'" Filing 46 at 49 (¶117), 52 (¶125); *see also* Filing 40–25 at 15–16 (Dr. Trangle testifying that Bingham "was normal" had "no neurological deficit" or "cognition deficits" and likely recovered from his stroke "within a matter of days").

Notwithstanding his deposition testimony, other portions of his brief, and the testimony of his own retained expert, Bingham argues that he still qualifies as actually disabled under the ADA. *See* Filing 42 at 10–11. Yet, in making this argument Bingham does not identify even one major life activity that he claims has been substantially limited. *See* Filing 42 at 10–11. This is problematic because "Courts have required the plaintiff to specify the major life activity in which he claims to be substantially limited." *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 188 (1st Cir. 2011) (citing cases from the Seventh and Tenth Circuits). Bingham instead claims, "Union Pacific has repeatedly asserted that Bingham's medical condition prevents him from working for five years because he is purportedly unable to operate company vehicles, work on or near moving trains, or work where decisions can affect the safety of others." Filing 42 at 12. Bingham's use of the word "purportedly" is telling.[15] He does not claim he is unable to do any of these things; he claims that Union Pacific says he cannot do any of these things. This does not support an "actual" disability claim. Therefore, even if the Court were to accept for the sake of argument that Bingham has a "physical or mental impairment" as that term is understood within the context of the ADA, no reasonable jury could find that one or more of his major life activities has been substantially

---

[15] *See Purport*, Black's Law Dictionary, 1492 (11th ed. 2019) ("To profess or claim, esp. falsely; to seem to be").

limited. *See* 42 U.S.C. § 12102(1)(A); *Danker v. City of Council Bluffs, Iowa*, 53 F.4th 420, 423 (8th Cir. 2022) ("A genuine issue of material fact exists when a reasonable jury could return a verdict for the nonmoving party" (internal quotation marks and citation omitted)).

The Court's conclusion is buttressed by a similar case that was recently decided in the Southern District of Iowa. *See Jackson v. Union Pac. R.R. Co.*, No. 419CV00069RGERAW, 2021 WL 1726895, at *13 (S.D. Iowa Mar. 29, 2021).[16] There, as here, the plaintiff suffered a stroke while employed by Union Pacific, and Union Pacific subsequently imposed work restrictions for a period of five years based on concern that the plaintiff posed a potential safety risk. *See id.* at *3. The district court acknowledged that "[a] stroke causing long-term deficits may be a 'physical or mental impairment' under the ADA." *Id.* (citing cases). However, it went on to conclude that the plaintiff in this case "fail[ed] to show he was actually disabled because his stroke-related deficits do not constitute 'physical impairment[s]' under the ADA." *Id.* In reaching this determination, the court noted the absence of any evidence indicating that the plaintiff's "stroke left him with permanent or long-lasting physical or mental deficits." *Id.* The same is true here. Again, Bingham argues in his brief that he "recovered completely" from his "minor stroke" and his own retained expert testified that he likely recovered "within a matter of days." See Filing 42 at 1; Filing 40–25 at 15–16. In further similarity to the present case, the court in *Jackson* separately observed that the plaintiff in that case "fail[ed] to demonstrate any stroke-related deficits substantially limited his

---

[16] The Court notes that the plaintiff in *Jackson* was represented by one of the same attorneys who represents Bingham in this case. The Court further notes that although the plaintiff in *Jackson* initially appealed the district court's Order to the Eighth Circuit, the plaintiff moved to dismiss the case on the day before oral argument was set to take place. *See Jackson v. Union Pacific R.R. Co.*, 21-1943, 5098095. Union Pacific protested this last second motion to dismiss and noted that the plaintiff's "counsel represents plaintiffs in a number of ongoing lawsuits against Union Pacific alleging that its fitness-for-duty policies violate the ADA" and that this "dubious dismissal the night before oral argument appears to be an attempt to mitigate against the risk of an unfavorable opinion that may disadvantage his strategy in other cases." *See Jackson v. Union Pacific R.R. Co.*, 21-1943, 5098307. Despite Union Pacific's objection, the Eighth Circuit ultimately granted the plaintiff's motion to dismiss on November 22, 2021. *See Jackson v. Union Pacific R.R. Co.*, 21-1943, 5100502.

major life activities." *Id.* at *14. Bingham has also failed to do so. During his deposition, Bingham was adamant that his stroke did not limit him in any relevant way. See Filing 40-2 at 67. For the foregoing reasons, the Court concludes that Bingham is not actually disabled within the meaning of the ADA.

### 2. *Bingham Does Not Have a Record of Disability*

#### a. The Parties' Arguments

Union Pacific also argues that "[b]ecause Bingham cannot establish his alleged conditions amount to a physical or mental impairment that substantially limits a major life activity, he cannot show the records for those conditions constitute a 'record of' a disability." Filing 39 at 11 n.2. Bingham responds by arguing that Union Pacific created his record of disability when Dr. Hughes imposed functional work restrictions based on his conclusion that he suffered a stroke. Filing 42 at 11. Bingham also notes that "Union Pacific's medical director attested that Bingham was disabled and therefore eligible for disability benefits." Filing 42 at 11 (citing Filing 42-15). Specifically, Union Pacific's medical director certified on May 15, 2019, that Bingham "has been disabled from performing [his] regular occupation from" May 2, 2019 to December 31, 2025, and was deemed "permanently disabled from [his] regular occupation[.]" *See* Filing 42–15.[17]

#### b. Applicable Standards

"An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). "Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the

---

[17] Bingham also argues that this demonstrates he is actually disabled. Filing 42 at 12. The Court has considered this evidence and argument as they relate to whether he has an actual disability as well as whether he has a record of disability.

maximum extent permitted by the ADA and should not demand extensive analysis." 29 C.F.R. § 1630.2(k)(2). As the First Circuit has put it, an "actual" disability and a "record of" disability "represent two sides of the same coin" because "[b]oth definitions hinge on whether the plaintiff has shown a physical or mental impairment that affects a major life activity, and if so, whether the impairment substantially limits the major life activity." *Mancini v. City of Providence by & through Lombardi*, 909 F.3d 32, 40 (1st Cir. 2018). The "salient distinction" between the two is that an "actual" disability "requires a showing that the plaintiff has a cognizable disability" whereas a "'record of disability' may be satisfied by a showing that the plaintiff had a disability in the past (even though he no longer suffered from that disability when the allegedly discriminatory action took place)." *Id.* Either way, in determining whether an individual has a disability under the 'actual disability' or 'record of' prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 29 C.F.R. § 1630.2(j)(4)(iii).

      c.  Discussion

      The fact that Union Pacific may have been aware of, maintained, or even created "records" pertaining to Bingham's stroke does not mean that Bingham has established a "record of" disability for purposes of the ADA. Such "records" must still relate to "a physical impairment that substantially limits one or more major life activities of [an] individual[.] *See* 42 U.S.C. § 12102(1)(A)–(B); *see also Doherty v. Nat'l Bd. of Med. Examiners*, 791 F. App'x 462, 466 (5th Cir. 2019) (explaining that "diagnosed disorders do not satisfy the ADA's definition of a disability unless they substantially limit one or more major life activities as compared to the general population"); *Clarke v. Mortg. Lenders of Am., LLC*, No. 14-2526-JWL, 2016 WL 1030039, at *4 (D. Kan. Mar. 10, 2016) (noting that the Tenth Circuit "has cautioned that a plaintiff may not

18

simply identify an impairment and leave the court to infer that it results in substantial limitations to a major life activity").

To support his record of disability theory, Bingham cites *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647, 659 (D. Neb. 2022)—a case that was recently decided by a different Judge in this District. *Baker* involved a Union Pacific employee who brought suit under the ADA once Union Pacific "imposed work restrictions that prevented him from returning to work for a year after a fitness-for-duty assessment." *Id.* at 651. In denying Union Pacific's motion for summary judgment, the *Baker* court ruled that the plaintiff "clearly has a record of disability in that he was removed from his safety-sensitive position for over a year by reason of a report of ill health." *Id.* at 659. The undersigned Judge has considered the *Baker* case but is not convinced that merely being removed from a safety-sensitive position for a particular term due to a report of ill health necessarily qualifies as a "record of" disability under the ADA. If the term "record of disability" were really that expansive, then almost any medical issue requiring a hospital visit would seem to qualify. The undersigned respectfully disagrees with this formulation because "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv); *see also Mancini*, 909 F.3d at 45 (explaining that the plaintiff "was obliged to offer some evidence that he was substantially limited in the performance of one or more major life activities at the time of the allegedly discriminatory action ('actual disability') or some time prior to that ('record of disability'), and he . . . defaulted on that obligation").

Even if the Court were to assume that Bingham's stroke constitutes a past "impairment," not every impairment constitutes a disability. 29 C.F.R. § 1630.2(j)(1)(ii). The burden is on Bingham to identify the major life activity that was impacted by this prior impairment. *See*

*Mancini*, 909 F.3d at 42 (noting "it is the plaintiff's burden to identify the major life activity that is affected" in both actual and record of disability claims). If the plaintiff meets his burden of identifying an activity that does in fact qualify as a "major life activity," the Court then asks whether he "adduced evidence sufficient to create a genuine issue of material fact as to whether his impairment substantially limits" the major life activity he has identified. *See id.* This is where Bingham's "record of" claim fails. At no point in his brief does Bingham identify a major life activity that was impacted by his stroke before he was, in his words, "effectively terminated[.]" *See* Filing 1 at 3 (¶20). He has therefore failed to meet his burden.[18]

Bingham notes that "Dr. Hughes concluded that [he] suffered from a frontal cortex cerebrovascular accident or stroke[,]" Filing 42 at 11, but that fact speaks only to whether Bingham suffered a past "physical or mental impairment," not to whether that impairment affected a "major life activity." It is Bingham's burden to identify both an impairment and its effect on a major life activity. *Mancini*, 909 F.3d at 42. Indeed, it is difficult to see how Bingham could argue that a major life activity of his had been impacted given his admission that he "recovered completely" from this "minor stroke" within a matter of weeks and "could perform any activity that any ordinary person might[.]" Filing 42 at 4.

The Court also notes that Bingham has not adequately alleged he was substantially limited in his major life activity of working. In fact, he takes the opposite position elsewhere in his brief. *See e.g.*, Filing 42 at 29–30 (Bingham arguing that "Union Pacific could have placed [him] in another maintenance of way position that did not require, for example, driving a truck"). The only thing he claims is, "Union Pacific's medical director attested that [he] was disabled and therefore

---

[18] Indeed, his brief devotes less than half of a page to this position and largely relies on the same arguments he made in furtherance of his actual disability claim. *See* Filing 42 at 12 (Bingham arguing, "[f]or the reasons explained above, and by its own admission, Union Pacific has created the record of [his] disability").

eligible for disability benefits." Filing 42 at 11. However, in order for Bingham to have been limited in his major life activity of working, "it would have required [him] to show a substantial limitation in his 'ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." *Mancini*, 909 F.3d at 43 n.6 (quoting 29 C.F.R. pt. 1630, App. at 390); *see also Carothers v. Cty. Of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015) (explaining that a plaintiff's inability to perform the unique aspects of a specific job does not constitute a substantial limitation on the major life activity of "working"). Bingham's workplace restrictions may have prevented him from performing unique aspects of his track inspector position, but he has made neither an argument nor an evidentiary showing that he is limited in the major life activity of working.

Furthermore, while Union Pacific's medical director did sign paperwork for the Railroad Retirement Board on May 15, 2019, attesting that Bingham was "permanently disabled from his . . . regular occupation[,]" Filing 42-15 at 3, he points to no authority that suggests being "disabled" for the purposes of railroad employment benefits eligibility equates to being "disabled" for purposes of the ADA. It does not logically follow that by qualifying for railroad disability benefits, a plaintiff necessarily has an actual disability or record of disability under the ADA. *Cf. Janzen v. Portfolio Recovery Assocs., L.L.C.*, No. 21-CV-1107-EFM, 2022 WL 4182314, at *4 (D. Kan. Sept. 13, 2022) (rejecting the plaintiff's argument that she had a record of disability based on her past receipt of social security disability benefits). Indeed, the difference is between inability to perform his "regular occupation," which qualifies him for disability insurance benefits, and "[in]ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." *Mancini*, 909 F.3d at 43 n.6 (internal quotation marks and citations omitted).

Finally, Bingham has not argued that the five days he spent in the hospital substantially limited a major life activity, but even if he had the Court would not find such an argument to be convincing. Pre-ADAAA case law made clear that "simply being hospitalized does not establish a record of an impairment under the ADA." *Heisler v. Metro. Council*, 339 F.3d 622, 630 (8th Cir. 2003) (cleaned up) (quoting *Gutridge v. Clure*, 153 F.3d 898, 901 (8th Cir. 1998)); *see also Adams v. Rice*, 531 F.3d 936, 952 (D.C. Cir. 2008) (agreeing with a Second Circuit decision in concluding "that a record of temporary hospitalization, without more, is insufficient to prove a disability"); *Burch v. Coca-Colo Co.*, 119 F.3d 305, 317 (5th Cir. 1997) ("The ADA requires an individualized inquiry beyond the mere existence of a hospital stay"). In *Heisler*, for example, the Eighth Circuit concluded that "[b]eing hospitalized on four occasions for short periods of time, taking medications, and receiving shock therapy treatments [did] not in and of themselves establish that [the plaintiff's] depression . . . ever substantially limited the major life activities she . . . asserted in [that] litigation." *Heisler*, 339 F.3d at 630; *see also Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1088 (10th Cir. 1999) (concluding that the patient's "five day hospitalization and subsequent recovery time" did not substantially limit a major life activity). The Court acknowledges that the foregoing authority predates the ADAAA, and further recognizes that since the passage of the ADAAA, "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." 29 C.F.R. § 1630.2. Still, the Court is unaware of any case law—and Bingham does not point to anything—suggesting that a five-day hospital stay is, by itself, enough to demonstrate a past substantial limitation on a major life activity even under the ADAAA.

For the foregoing reasons, the Court concludes that Bingham does not have a record of disability within the meaning of the ADA. Because no reasonable jury could find that Bingham

has demonstrated either an actual disability or a record of disability, this means that his reasonable accommodation claim in Count II fails, and the Court grants summary judgment in Union Pacific's favor on Count II. *Duello*, 628 F.3d at 972*; Anderson v. Rugged Races, LLC*, 42 F.4th 955, 958 (8th Cir. 2022) (noting that summary judgment is appropriate "when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact from which a reasonable jury could return a verdict for the nonmoving party").

### 3.  *Bingham Was Not Regarded as Having a Disability*

#### a.  The Parties' Arguments

The Court now turns to whether Bingham's disparate treatment Claim in Count I can go forward based on Bingham's claim that Union Pacific "regarded" him as disabled. Primarily relying on the Eighth Circuit's decision in *Morriss* and the district court's order in *Jackson*, Union Pacific argues that its decision was motivated by "Bingham's predisposition to sudden incapacitation for a five year period which is insufficient under Eighth Circuit law to establish an employer 'regards' an employee as disabled." Filing 47 at 8; Filing 39 at 12–14. Bingham disagrees with this premise. *See* Filing 42 at 12. He does not address the *Jackson* case but does argue—albeit in a footnote—that *Morriss* is distinguishable. Filing 42 at 12 n.5.[19] He submits his case is different because Union Pacific "does not dispute that Bingham suffered 'a frontal cortex cerebrovascular accident'" whereas in *Morriss* the Eighth Circuit concluded that the plaintiff's obesity was "'not the result of a physiological disorder' and therefore not an 'impairment.'" Filing 42 at 12 n.5.

---

[19] Although Union Pacific cites the *Jackson* case extensively throughout its opening brief and relies on it for many different propositions, Bingham only references it once in his opposition brief. *See* Filing 42 at 9. Specifically, Bingham argues that the *Jackson* decision is an "outlier" because it applied the *McDonnell Douglas* burden shifting framework. Filing 42 at 9. Bingham does not address Union Pacific's reliance on *Jackson* for the separate proposition that Bingham was not regarded as disabled.

b.   Applicable Standards

"Under the ADA, being regarded as disabled by an employer can suffice to establish a disability within the meaning of the statute if the plaintiff shows that his employer subjected him to an adverse action 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Fischer*, 792 F.3d at 988 (quoting 42 U.S.C. § 12102(1), (3)(A)). Thus, "a person is regarded as disabled if her employer mistakenly believes that she has a physical impairment that substantially limits one or more major life activities or mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Canning*, 995 F.3d at 615; *see also* 29 C.F.R. § 1630.2(l)(1)–(2). Unlike "actual" disabilities and "record of" disabilities, "[w]hether an individual's impairment 'substantially limits' a major life activity is not relevant" when the individual claims that his employer "regarded" him as disabled. *See* 29 C.F.R. § 1630.2(j)(2). Still, "the ADA does not prohibit an employer from acting on some other basis, *i.e.*, on its assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment." *Morriss*, 817 F.3d at 1113; *see also id.* (quoting 29 C.F.R. Pt. 1630, App'x § 1630.2(h)). As the Seventh Circuit has put it, "[i]f the impairment does not yet exist, it can be neither actual nor perceived." *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019). Indeed, "the EEOC's own interpretive guidance specifically states that 'the definition [of impairment] . . . does not include characteristic predisposition to illness or disease." *Morriss*, 817 F.3d at 1113 (alterations in original) (quoting 29 C.F.R. Pt. 1630 App'x § 1630.2(h).

c.   Discussion

There is no genuine dispute that Union Pacific prevented Bingham from continuing to work as a track inspector after its in-house occupational medicine physician conducted a fitness for duty examination and imposed restrictions aimed at mitigating the risk posed by a sudden

24

incapacitation. *See* Filing 43 at 105. Bingham admits in his brief that Union Pacific imposed the restrictions that it did based on its determination "that anyone who has suffered a stroke like Bingham's is categorically deemed to have a 1% or greater risk of 'sudden incapacitation.'" Filing 42 at 1. Even in his Complaint, Bingham alleged that "Union Pacific . . . claimed that [his] stroke put him at an unacceptably high risk of suddenly losing consciousness while at work, which it said puts him [at] an unacceptably high risk of seriously injuring himself or others, and issued restrictions against him." Filing 1 at 2 (¶10).[20] Thus, even he acknowledges that the workplace restrictions which eventually led to his job loss were not based on a "current" impairment (whether actual or perceived), but instead on Union Pacific's "assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment." *Morriss*, 817 F.3d at 1113; *see also Fischer*, 792 F.3d at 989 (concluding it was not unreasonable for an employer "to observe that a worker who possesses less than the required strength to perform a physically demanding job faces an increased risk of injury" and that this "observation [did] not lead to a reasonable inference that [the employer] regarded [the plaintiff] as having a physical impairment related to his back"); *Shell*, 941 F.3d at 335-36 (concluding that the ADA's "regarded as" prong does not cover situations "where an employer views an applicant as at risk for developing a qualifying impairment in the future"). Accordingly, no reasonable jury could find that Union Pacific regarded Bingham as disabled.

The *Jackson* case is also particularly instructive given its factual similarity to the case before this Court. Just as the Court does in this case, the court in that case reasoned that the plaintiff (who, again, suffered a stroke) "fail[ed] to present sufficient evidence to suggest Union Pacific regarded him as disabled when it placed him on a five-year waiting period with work restrictions."

---

[20] *See Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001) ("factual statements in a party's pleadings are generally binding on that party unless the pleading is amended").

*Jackson*, 2021 WL 1726895, at *14. The *Jackson* court concluded that "Union Pacific's decision to issue work restrictions and a five-year waiting period [did] not indicate Union Pacific believed [the plaintiff] *had* a physical impairment. It show[ed] Union Pacific believed Jackson was *at risk* of becoming physically impaired and creating a safety hazard while performing his job." *Id.* (internal citation omitted). This Court agrees with that logic and finds that it applies with equal force here. Other circuit courts have relied on this same logic to reach similar conclusions. *See e.g.*, *Equal Emp. Opportunity Comm'n v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018), as amended, (Sept. 12, 2018) (noting "the parties agree that for [the defendant] to have regarded [the plaintiff] as having a disability, [the defendant] must have regarded him as having a current impairment" and that this reading comports both with the statutory text of the ADA and the Eighth Circuit's decision in *Morriss*); *Shell*, 941 F.3d at 336–37 (citing *Morriss* and other circuit court decisions to support the conclusion that the ADA's text "plainly encompasses only current impairments, not future ones"); *cf. Darby v. Childvine, Inc.*, 964 F.3d 440, 446 (6th Cir. 2020) ("We agree that a genetic mutation that merely predisposes an individual to other conditions, such as cancer, is not itself a disability under the ADA").

Ultimately, there is no genuine dispute of fact that Union Pacific took the action that it did based on its concern that Bingham was predisposed to suffering a future, sudden incapacitating event. The Eighth Circuit has expressly recognized the difference between an employer discriminating on the basis of a currently existing physical impairment and "acting on some other basis, *i.e.*, on its assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment." *Morriss*, 817 F.3d at 1113. The latter is permissible under the ADA. *Id.* Union Pacific's belief that Bingham "was *at risk* of becoming physically impaired and creating a safety hazard while performing his job" does not mean that

Union Pacific "believed [Bingham] *had* a physical impairment." *See Jackson*, 2021 WL 1726895, at \*14. Just as the district court did under the similar set of facts presented in *Jackson*, this Court concludes that "Union Pacific believed [Bingham] was unqualified to perform his job duties due to his risk of sudden incapacitation," and, therefore, Bingham "cannot demonstrate Union Pacific regarded him as physically disabled when it issued work restrictions for a five-year waiting period." *Id.* at \*15.

4.  *Because No Reasonable Jury Could Find Bingham Was Disabled, Summary Judgment Is Appropriate on Counts I and II*

For the foregoing reasons, Union Pacific is entitled to summary judgment. Bingham's failure to establish either an actual disability or a record of disability precludes him from going forward on his reasonable accommodation claim in Count II. *Duello*, 628 F.3d at 972. Although he could theoretically go forward on his disparate treatment claim in Count I on a "regarded as" theory, he has failed to show that Union Pacific regarded him as disabled either. For these reasons alone, summary judgment is appropriate. However, just as the district court did in *Jackson*, this Court will now explain why alternative bases exist to grant summary judgment in Union Pacific's favor even if one were to assume *arguendo* that Bingham was actually disabled, had a record of disability, or was regarded as disabled.

### C.  Alternative Bases to Grant Summary Judgment

First, Bingham cannot show that Union Pacific's legitimate, nondiscriminatory purpose for its actions was pretextual. Therefore, once the *McDonnell Douglas* burden shifting framework is applied, it is clear that Bingham cannot go forward on Count I. Second, Union Pacific—as the employer—has met its burden of proving the affirmative, "direct threat" defense. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571–72 (8th Cir. 2007). Both of these alternative bases independently support granting summary judgment in Union Pacific's favor on Count I.

27

       *1. The* McDonnell Douglas *Burden Shifting Framework Applies*

         a.  The Parties' Arguments

The parties devote significant portions of their briefing to whether the *McDonnell Douglas* burden shifting framework provides the appropriate analysis for Bingham's disparate treatment claim in Count I. *See* Filing 39 at 5–9; Filing 42 at 6–10; Filing 47 at 1–5. Union Pacific submits that this framework applies. Filing 39 at 5–9. Bingham argues that it does not because—in his view—there is direct evidence of discrimination. *See* Filing 42 at 6–10.

         b.  Applicable Standards

"In the absence of direct evidence of discrimination, [courts] apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to disability-discrimination claims of disparate treatment." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). "Direct evidence is evidence that establishes a specific link between alleged discriminatory animus and an adverse action of such causal strength that the plaintiff can forgo the burden-shifting framework." *Id.* at 756 n.3. However, when the *McDonnell Douglas* burden shifting framework applies,

> The plaintiff first has the burden of establishing a prima facie case: (1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job; and (3) a causal connection between an adverse employment action and the disability. The burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. Finally, the burden shifts back to the employee to show that the proffered reason was, in reality, a pretext for discrimination.

*Oehmke*, 844 F.3d at 755 (internal citations omitted).

         c.  Discussion

In *Olsen v. Cap Region Med. Ctr.*, 713 F.3d 1149, 1154 (8th Cir. 2013), the Eighth Circuit applied the *McDonnell Douglas* burden shifting framework even though it was "undisputed that [the plaintiff] was disabled, because [the plaintiff] suffered from seizures which, while occurring,

incapacitated her and prevented her from performing her job duties." However, different district court judges in this circuit have reached different conclusions on whether the *McDonnell Douglas* burden shifting framework applies to cases like this. One judge in this district concluded, "there [was] direct evidence of discrimination because the defendant admittedly made the decision to remove [the plaintiff] from work for a year based on his perceived" disability and, therefore, "[t]he *McDonnell-Douglas* burden shifting paradigm [was] not applicable." *Baker*, 580 F. Supp. 3d at 659; *accord Sanders v. Union Pac. R.R. Co.*, No. 4:20CV3023, 2021 WL 4783629, at *8 (D. Neb. Oct. 7, 2021) (the same judge reaching the same conclusion). At the same time, one judge in the Southern District of Iowa and one judge in the Eastern District of Missouri reached the opposite conclusion. *See Jackson*, 2021 WL 1726895, at *11 ("Courts have applied the *McDonnell Douglas* burden-shifting framework where an employer terminated employment due to a perceived safety risk related to the employee's alleged disability"); *Bohner v. Union Pac. R.R. Co.*, No. 4:19-CV-02581-SEP, 2021 WL 3363063, at *4 (E.D. Mo. Aug. 3, 2021) ("In truth, this kind of case is routinely analyzed under *McDonnell Douglas*, and [the plaintiff] offers no persuasive authority suggesting otherwise"), *appeal dismissed*, No. 21-2962, 2021 WL 7186864 (8th Cir. Nov. 30, 2021).

The Eighth Circuit does not appear to have definitively resolved this issue. *See Oehmke*, 844 F.3d at 756 (8th Cir. 2016) (expressly declining to "reach [the defendant's] argument that in the context of the ADA a plaintiff may not use direct evidence to forgo the *McDonnell Douglas* burden-shifting framework"). Having considered Eighth Circuit precedent and other district court decisions that have applied it, the undersigned judge concludes that the *McDonnell Douglas* burden shifting framework applies because Bingham has not offered "evidence that establishes a specific link between alleged discriminatory animus and an adverse action of such causal strength

that the [he] can forgo the burden-shifting framework." *Oehmke*, 844 F.3d at 756 n.3 (citing *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012)); see also *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir. 2013) ("Because there is no direct evidence of discrimination, we proceed to the *McDonnell Douglas* analysis").[21]

Even assuming *arguendo* (and for the sake of this alternative conclusion only) that Bingham could establish all three elements of his prima facie case, that is not enough to survive summary judgment. *See Oehmke*, 844 F.3d at 755. The burden then shifts to Union Pacific "to articulate a legitimate nondiscriminatory reason for the adverse employment action." *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014). This burden of production is "not an onerous task." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014). Union Pacific argues that it had reasonable concerns regarding Bingham's ability to safely perform his job as a track inspector, Filing 39 at 21, and there is ample evidence in the record to support this. *See e.g.*, Filing 46 at 40 (¶100), at 41 (¶102), at 43 (¶105), at 45 (¶108), at 46–47 (¶111), at 47 (¶112). Union Pacific has therefore met its burden because "courts have routinely held that an employee's inability to safely perform the essential functions of the job constitutes a legitimate, nondiscriminatory reason for an employment action." *White v. Union Pac. R.R. Co.*, No. 4:19-CV-

---

[21] The Court also finds that following discussion from a recent case brought before the Western District of Texas to be persuasive:

> Direct evidence is evidence which, if believed, proves the fact without inference or presumption. The evidence before the court shows Defendant imposed broad work restrictions on Plaintiff based on multiple doctors' findings and assessments. However, showing Defendant imposed restrictions on Plaintiff's ability to work is not equivalent to showing Defendant restricted Plaintiff's duties because of a prejudice against a class of individuals with Plaintiff's alleged disability. Plaintiff provides no evidence showing Defendant is prejudiced against individuals with Defendant's alleged disability. Thus, to arrive at Plaintiff's intended conclusion, one would have to presume Defendant is prejudiced against said individuals. In other words, an inferential leap is required to arrive at the conclusion Defendant used discriminatory animus to restrict Plaintiff's ability to complete the essential functions of his job. Therefore, Plaintiff failed to produce direct evidence of discrimination.

*Carrillo v. Union Pac. R.R. Co.*, No. EP-21-CV-00026-FM, 2022 WL 3224000, at *5 (W.D. Tex. Aug. 9, 2022) (internal quotation marks, alterations, and footnote citations omitted).

00080-DGK, 2022 WL 1315089, at *8 (W.D. Mo. Jan. 11, 2022) (citing *Kosmicki v. Burlington N. & Santa Fe R. Co.*, 545 F.3d 649, 651 (8th Cir. 2008)); *see also Bohner v. Union Pac. R.R. Co.*, No. 4:19-CV-02581-SEP, 2021 WL 3363063, at *4 (E.D. Mo. Aug. 3, 2021) ("Union Pacific consistently identified a reason for its actions other than [the plaintiff's] protected status—namely, [the plaintiff's] inability to safely perform the essential job functions of a Skilled Signalman"), *appeal dismissed*, No. 21-2962, 2021 WL 7186864 (8th Cir. Nov. 30, 2021); *Owen v. Union Pac. R.R. Co.*, No. 8:19CV462, 2020 WL 6684504, at *7 (D. Neb. Nov. 12, 2020) (concluding that even if the Court were to assume the plaintiff had established a prima facie case of disability discrimination, the employer "stated a legitimate nondiscriminatory reason for removing [the plaintiff] from service—his safety").

The burden now shifts back to Bingham to demonstrate pretext. To do so, Bingham would need to "present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Winters v. Deere & Co.*, 63 F.4th 685, 690 (8th Cir. 2023) (internal quotation marks and citation omitted). The Eighth Circuit has said that a plaintiff may demonstrate pretext by showing that an "employer's explanation is unworthy of credence because it has no basis in fact" or "by persuading the court that a prohibited reason more likely motivated the employer." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (cleaned up). The Eighth Circuit has also said that "[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Id.* (internal quotation marks and citation omitted); *accord Winters*, 63 F.4th at 690.

31

Bingham has failed to satisfy his burden on this front. His brief barely addresses the issue of pretext save for a few passing, conclusory sentences. *See* Filing 42 at 11. He does not elaborate on the point, offer an alternative explanation, or cite evidence that sufficiently demonstrates Union Pacific's "articulated reason for the adverse employment action was false and that discrimination was the real reason." *Winters*, 63 F.4th at 690. Indeed, it is difficult to see how he could given that during his deposition he said he did not believe Union Pacific "had it out for" him or "wanted to get rid of" him. Filing 40-2 at 71. Nor does Bingham argue that Union Pacific "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Id.* (internal quotation marks and citation omitted). To the contrary, Bingham admits that Union Pacific imposed restrictions on him "based on its uniform policy that anyone who has suffered a stroke like [him] is categorically deemed to have a 1% or greater risk of 'sudden incapacitation.'" Filing 42 at 1.

Bingham asserts that there is no reason for this Court to consider pretext in the first place because he believes there is direct evidence of discrimination. *See* Filing 42 at 10. The Court has already rejected this position, and Bingham's decision not to argue this issue sufficiently in the alternative means that he has waived it. The Eastern District of Missouri recently considered a similar situation where the plaintiff "fail[ed] to apply the *McDonnell Douglas* standard and instead focuse[d] on demonstrating that [he] was 'qualified' under the ADA," thereby "neglect[ing] to offer any evidence of pretext." *Bohner*, 2021 WL 3363063, at *6. As such, the district court in that case concluded that even if the plaintiff were a qualified individual, "his disability discrimination claim . . . still fail[ed] because he [did] not offer evidence that Union Pacific's stated non-discriminatory reason was pretextual." *Id.*; *see also Krehbiel v. Union Pac. R.R. Co.*, No. 19-2002-JAR, 2020 WL 5503363, at *11 (D. Kan. Sept. 11, 2020) (concluding that because the plaintiff

did not address the defendant's nondiscriminatory assertion or pretext and failed to respond to the defendant's argument regarding discriminatory intent, the plaintiff "appears to concede [the defendant's] assertion that there was no discriminatory intent" and therefore could not "demonstrate [the defendant's] decision was pretextual"). The same holds true here. Bingham's failure to demonstrate pretext serves as an alternative basis to grant summary judgment in Union Pacific's favor on Count I.

      *2.  Union Pacific has Met its Burden to Show Bingham Posed a Direct Threat*

        a.  The Parties' Arguments

In addition to the foregoing, Union Pacific also argues that it is entitled to summary judgment based on the "direct threat" affirmative defense. *See* Filing 39 at 27–40. That is, Bingham's increased risk to suffer a future, incapacitating event posed a "direct threat" to the health or safety of himself or others and this threat could not be eliminated by reasonable accommodation. Filing 39 at 27 (citing 42 U.S.C. § 12113(b) and 29 C.F.R. § 1630.2(r)). Bingham argues that Union Pacific cannot prevail on this affirmative defense at summary judgment because there are genuine issues of material fact that require resolution on this matter. Filing 42 at 19 Specifically, Bingham points to: (1) whether Union Pacific conducted an "individualized assessment" into his ability to safely perform the essential functions of his job; (2) whether Union Pacific was entitled to rely on FMCSA guidance because an employer must use the "most current medical knowledge and/or best available objective evidence" to establish this affirmative defense, *see Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *see also* 29 C.F.R. 1630.2(r); and (3) whether Union Pacific considered the four factors set forth in 29 C.F.R. § 1630.2(r) before arriving at its decision.

b.  Applicable Standards

The ADA permits employers to "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *See* 42 U.S.C. § 12113(a)–(b). The EEOC has defined the term "direct threat" to mean "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). In order to determine that an individual poses a direct threat, there must be "an individualized assessment of the individual's present ability to safely perform the essential functions of the job" and this assessment must also "be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* The EEOC has identified four factors that are to be specifically considered in determining whether an individual would pose a direct threat. *Id.* They are: (1) the duration of the risk; (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id.* Union Pacific bears the burden of proving this affirmative defense under Eighth Circuit precedent. *Wal-Mart Stores, Inc.*, 477 F.3d at 571–72.

c.  Discussion

The Court concludes that Union Pacific is entitled to summary judgment on Count I because it has established that Bingham posed a direct threat based on his increased risk of suffering a sudden incapacitating event. Just as the district court determined in *Jackson*, this Court concludes that "[n]o reasonable jury could find Union Pacific's direct threat determination was not objectively reasonable." *Jackson*, 2021 WL 1726895, at *19. No one disputes that Bingham occupied a "safety sensitive" position at Union Pacific. Filing 40-2 at 30. Bingham admitted during his deposition that if he were to suddenly lose consciousness, he could pose a potential danger to himself and others if he were to stumble, fall, and be struck by a locomotive. Filing 40–2 at 26–

34

27. As Union Pacific persuasively argues, "if Bingham suffered a workplace seizure and injured himself or someone else, Union Pacific would have to answer for why it failed to heed [its own doctor's] conclusion." Filing 39 at 40; *cf. Witchet v. Union Pac. R.R. Co.*, No. 8:18CV187, 2020 WL 12762513, at *9 (D. Neb. Feb. 21, 2020) ("Allowing [the plaintiff] to continue driving could expose U.P. to a risk of liability that it is unwilling to take, and could expose the public to a risk of injury. Though that risk may be small, the consequences are severe"). The Court will now explain why no reasonable jury could conclude otherwise. *See Danker*, 53 F.4th at 423.

i.   Union Pacific Conducted an Individualized Assessment

Just like in *Jackson*, Union Pacific reached its decision here based on an "individualized assessment" of the plaintiff and "relied on doctors' evaluations and facts contained in medical documentation." *Jackson*, 2021 WL 1726895, at *19. It is undisputed that Union Pacific requested medical records relevant to Bingham's stroke and had Dr. Hughes—a board certified occupational medicine physician with ten years of experience evaluating railroad workers—conduct a FFD evaluation to determine whether Bingham could return to work. *See* Filing 46 at 38–39 (¶¶92–98). There is no dispute that Dr. Hughes reviewed Bingham's medical records in conducting his FFD and before concluding that work restrictions would be imposed. *See* Filing 46 at 44 (¶106). Thus, no reasonable jury could find that the FFD evaluation was not an "individualized assessment."

Bingham argues he did not receive an individualized assessment because Union Pacific's doctor did not talk with or examine Bingham and Dr. Hughes limited his fitness for duty examination to reviewing Bingham's medical records. Filing 42 at 20. Bingham also notes that Dr. Hughes did not talk with his treating physicians in reaching his FFD determination. Filing 42 at 21. However, just as in *Jackson*, there is no indication from the record that Bingham's treating providers "knew of or understood his specific job duties." *Jackson*, 2021 WL 1726895, at *19. Both Griebel and Dr. Caller made this quite clear. *See* Filing 40-5 at 9; Filing 40-8 at 1.

35

Nor does Bingham point to any authority suggesting that a personal examination is required to meet the "individualized assessment" requirement. Other courts have rejected this argument as well. *See e.g.*, *Krehbiel v. Union Pac. R.R. Co.*, No. 19-2002-JAR, 2020 WL 5503363, at *9 (D. Kan. Sept. 11, 2020) (concluding that the plaintiff received an individualized assessment when Union Pacific's in-house medical staff reviewed the plaintiff's medical records and drafted a FFD determination even though they did not personally examine the plaintiff); *cf. Coleman v. Pennsylvania State Police*, 561 F. App'x 138, 145 (3d Cir. 2014) (explaining that although the Rehabilitation Act required an "individualized determination" in order to find that an employee posed a direct threat, it did not require the employer's physician to examine the plaintiff directly). It is undisputed that Dr. Hughes reviewed all of the medical records Bingham submitted in reaching his FFD determination. Filing 46 at 39 (¶99). In sum, "[b]ecause Union Pacific relied on objective evidence specific to [Bingham], Union Pacific based its decision to issue work restrictions on the required individualized assessment." *See Jackson*, 2021 WL 1726895, at *19.

ii. Union Pacific Relied on Objectively Reasonable Medical Judgment

Bingham also argues that Union Pacific did not rely on objectively reasonable medical judgment. In so doing, he primarily takes issue with Union Pacific's FFD guidelines themselves. *See* Filing 42 at 5. According to Union Pacific's former Chief Medical Officer, Dr. John Holland, the Federal Railroad Administration has "not adopted regulations with comprehensive standards and FFD requirements for railroad workers in safety sensitive positions[.]" Filing 40-11 at 3. Thus, "Union Pacific decided to adopt its own medical standards for safety sensitive railroad workers." Filing 40-11 at 3. Per Dr. Holland, "Union Pacific determined that the most relevant medical FFD guidelines for health conditions which posed significant risks for sudden incapacitation were the [Federal Motor Carrier Safety Administration's (FMCSA's)] medical FFD guidelines for

commercial motor vehicle drivers which are found in the FMCSA 2014 Medical Examiner Handbook." Filing 40-11 at 3.

Bingham disputes that "the most relevant guidelines were from the FMCSA Handbook and/or that it was otherwise reasonable to rely on the handbook." Filing 46 at 29 (¶72). He also contends that Union Pacific did not adopt the written guidelines as written and instead issued "standards that are more conservative than the [FMCSA] guidelines, both in letter and application." Filing 46 at 29 (¶72). However, Bingham does not dispute that Union Pacific adopted its own guidelines based upon the lack of FRA guidelines; nor does he dispute that Union Pacific's guidelines are generally patterned after the FMCSA guidelines. *See* Filing 46 at 29 (¶72).  In conducting Bingham's FFD evaluation, Dr. Hughes relied upon the recommendations in the 2014 FMCSA Handbook and ultimately concluded that Bingham was at an unacceptable risk of sudden incapacitation for five years. Filing 46 at 41 (¶101); *see also* Filing 40-21 at 2. Bingham argues that Dr. Hughes's reliance on the FMCSA guidelines do not reflect objectively reasonable medical judgment for four reasons. *See* Filing 42 at 6, 20–23. The Court will address them in turn.

(1) It does not matter that Track Inspectors are Not
Required to Have Commercial Driver's Licenses

Bingham first argues that the FMCSA guidelines apply to those with commercial driver's licenses, not track inspectors. Filing 42 at 22–23. The parties agree that "Bingham has never been required to have a commercial driver's license for his job at Union Pacific." Filing 46 at 61 (¶159). However, this argument is unavailing given the lack of contrary—or any—guidance promulgated by the Federal Railroad Administration. *See* Filing 40-11 at 3. The FMCSA Handbook governed those with commercial driver's licenses specifically to be sure, but "just as there are many medical conditions that will revoke an individual's license to drive, safety-critical jobs require an employer to minimize potential risks to ensure the safety of all employees and the general public." *Reinacher*

*v. Alton & S. Ry. Co.*, 203 F. Supp. 3d 958, 967–68 (S.D. Ill. 2016). There is no dispute that Bingham's job as a track inspector was considered a "safety-sensitive" position by the Federal Railroad Administration. *See* Filing 46 at 6 (¶22); *see also* 49 C.F.R. § 214.7. Although Bingham disputes whether the FMCSA guidelines should apply, he does not dispute that Union Pacific adopted its own medical standards patterned on the FMCSA guidelines because the Federal Railroad Administration has not issued its own set of regulations. *See* Filing 46 at 29 (¶72).

When Bingham's own expert, Dr. Kevin Trangle, was asked at his deposition whether there was an alternative standard apart from the FMCSA guidelines Union Pacific could have relied on when making its decision in this case, he responded that it should "have relied upon medical judgment" that was individualized to Bingham's case. *See* Filing 40-25 at 13. However, Dr. Trangle did not identify any alternative standard or specific set of guidelines that he believed better reflected the most current state of medical knowledge. *See generally* Filing 40-25 at 10–13. Nor has Bingham pointed to any such alternative standard or specific guideline in his brief. *See generally* Filing 42. Accordingly, to the extent Dr. Hughes relied upon the FMCSA guidelines after reviewing Bingham's medical records and decided to apply workplace restrictions as a result, that was within his reasonable medical judgment. Given this, no reasonable jury could find that Union Pacific's reliance on guidelines that were patterned on those applicable to commercial drivers—a comparable commercial transport business—was anything less than objectively reasonable. Dr. Morris said as much in his declaration. *See* Filing 40-16 at 3 ("The FMCSA guidance on the risk of unprovoked seizures after a stroke in the cortical region of the brain like that suffered by Mr. Bingham was at the time Union Pacific made the decision in this case the most current medical guideline for assessing the risk of an individual becoming suddenly incapacitated").

Regardless, this "Court's role is not to sit as 'super-personnel' department that microscopically dissects every aspect of Union Pacific's fitness-for-duty evaluation process and whether it reached the objectively correct decision." *White v. Union Pac. R.R. Co.*, No. 4:19-CV-00080-DGK, 2022 WL 1315089, at *10 (W.D. Mo. Jan. 11, 2022) (citing *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir. 2013)). No reasonable jury could find that because Bingham was not required to have a commercial driver's license Union Pacific's reliance on the FMCSA guidelines was objectively unreasonable.

> (2) The Applicable FMCSA Guidelines Pertinent to Bingham's Situation Are Still Relied Upon Notwithstanding Forthcoming Modifications

Bingham's second dispute with Dr. Hughes's reliance on the FMCSA guidelines is based on the fact that the FMCSA Handbook was withdrawn in 2015—"four years before Union Pacific relied upon it to effectively terminate [him.]" Filing 42 at 22. Union Pacific acknowledges that "the Handbook has been removed by the FMCSA to evaluate and make revisions to some provisions[.]" Filing 47 at 13. However, Union Pacific maintains this is of little consequence because according to Dr. Brian Morris—a physician on the Medical Review Board of the FMCSA—"[t]he FMCSA guidance on the risk of unprovoked seizures after a stroke in the cortical region of the brain like that suffered by Mr. Bingham was at the time Union Pacific made the decision in this case the most current medical guideline for assessing the risk of an individual becoming suddenly incapacitated." Filing 40-16 at 3. Dr. Morris went on to note during his deposition that even after the FMCSA Handbook was withdrawn, "physicians today, experts, neurologists, still think that the five-year waiting period is appropriate." Filing 40-16 at 1; *see also* Filing 40-18 at 2 (Dr. Morris stating, "Although the 2014 version of the Handbook is undergoing revisions, certified medical examiners continue to use it in making medical certification decisions"). Filing 40-18 at 2. Dr. Morris further opined that "[t]his approach is reasonable because

at no point has FMCSA stated that the information in the Handbook was obsolete and that certified medical examiners should disregard it." Filing 40-18 at 2. Dr. Morris also noted in his sworn declaration that during "an October 2022 FMCSA Medical Review Board meeting . . . an evidence report developed by a team including physicians and researchers was presented to the Board concluding they did not recommend any major changes to the 2014 FMCSA Handbook guidance on seizure disorders, including with regard to strokes." Filing 40-16 at 12. Therefore, even if the 2014 version of the FMCSA Handbook was withdrawn, Bingham does not point to anything showing that the specific guidelines at issue failed to reflect the most current medical guidance.

### (3) Dr. Hughes Reasonably Relied on Objective Evidence in Reaching his Conclusion

The third issue Bingham raises regarding the FMCSA guidelines is that they are, in his view, impermissibly applied by Union Pacific to require "categorical restrictions." Filing 42 at 5. However, this is just a regurgitation of his individual assessment argument the Court has already dispensed with.[22] To the extent Dr. Hughes—a board certified occupational medicine physician with ten years of experience evaluating railroad workers—relied upon Union Pacific's medical guidelines in imposing workplace restrictions after reviewing Bingham's medical records, that was within his reasonable medical judgment. *See Pontinen v. United States Steel Corp*., 26 F.4th 401, 406 (7th Cir. 2022) (noting that to the extent professionals in an ADA case "gave more weight to some of the evidence, that was within their 'reasonable medical judgment'").

---

[22] *See* Filing 42 at 23 (Bingham arguing, "The FMCSA Handbook offers mere guidance, and contemplates that the medical examiner will take the information and make an individualized assessment following an in-person examination" and that if he had "been subjected to such an individualized assessment, restrictions would not have been required, even under the FMCSA Handbook").

(4) Union Pacific Relied on an Objectively
Reasonable Opinion

The fourth and final issue Bingham raises with respect to the guidelines is his claim that
"[e]ven if it were reasonable to adopt a 1% threshold for risk of sudden incapacitation . . .
Bingham's provider and expert have found that Bingham's risk of sudden incapacitation was less."
Filing 42 at 24. Thus, in his view, Bingham should have been returned to work "even under Union
Pacific's flawed standards[.]" Filing 42 at 24. However, it does not matter whether Union Pacific's
FFD determination was the right call or whether another expert might disagree with Dr. Hughes'
conclusions; "the law only requires that the employer rely on an 'objectively reasonable' opinion,
rather than an opinion that is correct." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309
(6th Cir. 2015); *see also Jackson*, 2021 WL 1726895, at *20 ("In a direct threat analysis, the
factfinder does not resolve disagreements between experts, so long as the evidence viewed in the
light most favorable to the nonmoving party, shows the individualized assessment was objectively
reasonable"). No reasonable jury could find that Union Pacific's individualized assessment of
Bingham was based on anything other than objectively reasonable medical judgment.

iii.  The Four Factors Identified in 29 C.F.R. § 1630.2(r)

Bingham also contends that Union Pacific cannot prevail on its direct threat affirmative
defense because it "did not cite to *anything* demonstrating that [the four 29 C.F.R. § 1630.2(r)
factors] were considered contemporaneous with its decision to impose restrictions on [him]."
Filing 42 at 25 (emphasis in original). However, just as in *Jackson*, the record establishes that
"Union Pacific considered the factors outlined in 29 C.F.R. § 1630.2(r)" in reaching its direct threat
determination here. *Jackson*, 2021 WL 1726895 at *19.

The first factor considers the duration of the risk. 29 C.F.R. § 1630.2(r)(1). Union Pacific
did not impose indefinite restrictions upon Bingham; it limited these restrictions to five years,

41

consistent with FMCSA guidelines. *See* Filing 40-21 at 2; Filing 46 at 38–39 (¶¶90, 99). The fact that Union Pacific tied the duration of the restrictions to a specific period of time plainly establishes that it considered this factor.

The second factor considers the nature and severity of potential harm. 29 C.F.R. § 1630.2(r)(2). The record demonstrates that Dr. Hughes considered Bingham's position as a "Track Inspector" as part of his FFD determination. Filing 46 at 41–43 (¶104). Again, there is no dispute that this position is "safety sensitive." *See* Filing 40-2 at 27 (Bingham agreeing during his deposition that he had "a dangerous job"). Dr. Hughes then issued work restrictions to mitigate against the risk of Bingham suffering a future incapacitating event. *See* Filing 46 at 43–44 (¶105). In so doing, Dr. Hughes did not preclude Bingham from returning to work in any capacity; he "cleared Bingham to work" but with certain restrictions that were to remain in place for a five-year period. Filing 46 at 41 (¶102); *see also* Filing 46 at 44 (¶106). No reasonable jury could find that Dr. Hughes's FFD failed to consider the nature and severity of potential harm. *See Jackson,* 2021 WL 1726895, at *19 (concluding that Union Pacific considered this second factor because it evaluated the plaintiff "with regard to his specific job duties as a track laborer" and given that "a track laborer must operate machinery, sustain concentration, and respond to dangerous situations on the job, Union Pacific determined Jackson's risk of incapacitation on the job posed a serious safety risk").

The third factor considers the likelihood that potential harm will occur. 29 C.F.R. § 1630.2(r)(3). While the risk that Bingham might suffer a sudden incapacitating event while at work may not have been great, Union Pacific was entitled to weigh how much risk it was willing to accept, particularly given the safety-sensitive nature of the track inspector position and the potential for catastrophic consequences if Bingham were to become suddenly incapacitated while

working on or near the tracks. *Cf. E.E.O.C. v. Schneider Nat., Inc.*, 481 F.3d 507, 510 (7th Cir. 2007) (Posner, J.) (explaining that although the plaintiff had a "small" risk of fainting due to a medical condition, the employer was "entitled to determine how much risk is too great for *it* to be willing to take" (emphasis in original)). Dr. Hughes also specifically considered the location of Bingham's stroke in conducting his FFD determination and concluding that he posed an increased risk of a future sudden incapacitating event. *See* Filing 46 at 42 (¶104) (Dr. Hughes noting in his FFD records that, "At a minimum, employee will require a waiting period of 5 years for safety sensitive work due to increase risk for stroke and seizure from frontal cortex ischemic event").

The fourth factor considers the imminence of potential harm. 29 C.F.R. § 1630.2(r)(4). As used in this context, the phrase "imminence" encompasses not just certainty, but also the possibility for sudden onset. *See Anderson v. Norfolk S. Ry. Co.*, No. 21-1735, 2022 WL 1073581, at *3 (3d Cir. Apr. 11, 2022) (noting that although a train conductor may have gone long periods without experiencing loss of awareness associated with his syndrome, it "remain[ed] possible this could occur at any moment; thus, the risk is imminent"). The risk that Bingham would suffer a sudden incapacitating event while on the job—perhaps while on the railroad tracks or in their immediate vicinity—is precisely the type of imminent risk that Union Pacific sought to guard against by imposing workplace restrictions. There can be no serious dispute that Union Pacific considered this factor here.

### iv.  Summary and Conclusion

Just as in *Jackson*, because Bingham "fails to point to evidence in the record demonstrating a genuine issue of material fact as to the objective reasonableness of Union Pacific's direct threat assessment, he fails to overcome the affirmative defense." *Jackson*, 2021 WL 1726895, at *20. Accordingly, even if the Court were to assume for the sake of argument that Bingham had an actual

disability, a record of disability, or was regarded as disabled, the Court would nevertheless grant Union Pacific's Motion for Summary Judgment on this basis.

## III.   CONCLUSION

Because Bingham has failed to show either an actual disability or a record of disability, his reasonable accommodation claim in Count II fails as a matter of law. *Duello*, 628 F.3d at 972. Bingham's disparate treatment claim in Count I also fails because he has not only failed to show either an actual disability or a record of disability but has further failed to show that Union Pacific regarded him as disabled. Union Pacific is therefore entitled to summary judgment on Count I. In the alternative, Union Pacific is also entitled to summary judgment on Count I because Bingham has failed to show that its legitimate, nondiscriminatory, and safety-related bases for its actions were actually a pretext. Moreover, Union Pacific would also be entitled to summary judgment on Counts I (as yet another alternative basis) because it has met its burden of establishing the affirmative defense of direct threat. This resolution moots the need to take up Union Pacific's separate Motion to Strike, Filing 43.

Accordingly, it is ORDERED:

1.  The Court grants Union Pacific's Motion for Summary Judgment, Filing 38, for the reasons set forth in this Order;

2.  The Court denies Union Pacific's Motion to Strike, Filing 43 as moot; and

3.  The Court will enter a separate judgment in accordance with this Order.

Dated this 22nd day of September, 2023.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge

44